UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

SEVERSTAL US HOLDINGS, LLC, and
SEVERSTAL US HOLDINGS II, INC.,

                        Plaintiffs,            11 Civ. 6922

   -against-                            <u>OPINION</u>

RG STEEL, LLC,

                        Defendant.

----------------------------------------X

A P P E A R A N C E S :

        <u>Attorneys for Plaintiffs</u>

        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
        Four Times Square
        New York, NY  10036
        By:  Scott D. Musoff, Esq.
            Albert L. Hogan, III, Esq.

        <u>Attorneys for Defendant</u>

        CADWALADER, WICKERSHAM & TAFT LLP
        One World Financial Center
        New York, NY  10281
        By:  Martin L. Seidel, Esq.
            Joshua R. Weiss, Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/25/12

**SWEET. D.J.**

Defendant RG Steel ("RG Steel" or the "Defendant") has moved, pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 3, 4 and 5, to compel arbitration, appoint an arbitrator, and stay the declaratory judgment action commenced by the plaintiffs Severstal US Holdings, LLC ("SUSH") and Severstal US Holdings II, Inc. ("SUSH II") (collectively, "Severstal" or the "Plaintiffs") against RG Steel.  Based on the facts and conclusions set forth, the motion of RG Steel to compel arbitration and to stay this action is granted.

Assisted by eminent and highly-skilled counsel, the parties entered into a 63-page Stock Purchase Agreement (the "SPA"), dated as of March 1, 2011.  The SPA provided for the purchase of the equity in three U.S.-based steel companies from SUSH by RG Steel.  Notwithstanding the evident precision and detail of the SPA, these sophisticated parties vigorously dispute whether its arbitration provisions are enforceable as the buyer, RG Steel, contends, or whether the relief RG Steel seeks is limited to enforcement of the indemnification provided in the SPA.  As has occurred regrettably in the past, even

1

sophisticated parties and the best of lawyers do not agree on the effect of their jointly drafted contract.

**Prior Proceedings**

This action was commenced by the Plaintiffs on October 3, 2011 by the filing of their complaint seeking a declaratory judgment to bar the arbitration sought by RG Steel and to limit its relief to indemnification.  On November 7, 2011, RG Steel sought an order to compel arbitration, appoint an arbitrator and stay this action.

The instant motion was heard and marked fully submitted on December 9, 2011.

**The Facts**

The facts are set forth in the complaint and the affidavits submitted by the parties and are not in dispute except as noted below.

RG Steel is a Delaware limited liability company that manufactures a variety of steel mill products, including hot-rolled, cold-rolled, and coated sheets, and tin mill products.

2

SUSH is a Delaware limited liability company.  It is the sole owner of the issued and outstanding equity interests of SUSH II, a Delaware corporation and former owner of the equity interests of Severstal Sparrows Point, LLC ("Severstal Sparrows Point"). SUSH and SUSH II are part of Severstal International, which has operations in Russia, the United States and elsewhere.

RG Steel, SUSH, SUSH II and Severstal Sparrows Point entered into a March 1, 2011 SPA, which provided that RG Steel would purchase the equity in three U.S.-based steel companies from SUSH.  The facilities are located in Sparrows Point, Maryland, Warren, Ohio and Wheeling, West Virginia and were acquired by Severstal between May 2008 and August 2008.   In connection with the transaction, RG Steel purchased all of the equity of Severstal Sparrows Point, which in turn owned all of the outstanding equity in Severstal Warren LLC ("Warren") and Severstal Wheeling Inc. ("Wheeling").

The SPA established a two-step process for determining the ultimate purchase price to be paid by RG Steel.  First, the SPA required Severstal to calculate the "Initial Purchase Price" (the "IPP"), the actual cash amount to be paid by RG Steel at closing.  The IPP had three components:  (1) a negotiated amount of $125 million that would be adjusted by (2) the amount by

3

which the estimated net working capital at closing exceeded or
was less than a target amount of $450 million (the "Target Net
Working Capital") and (3) the amount by which the estimated bank
debt at closing owed by the entities to be acquired exceeded or
was less than a target amount of approximately $311 million (the
"Target Net Citicorp Indebtedness").  SPA § 1.04(a).

        Not less than two business days prior to closing, the
SPA required Severstal to deliver to RG Steel, "a statement [the
"Estimated Closing Statement"] setting forth an estimate of (A)
the Net Working Capital (determined in accordance with Section
1.04(b)(ii)) and (B) the Net Citicorp Indebtedness . . . as of
the opening of the business on the Closing Date (the "Effective
Time").  SPA § 1.04(a)(i).  The SPA defines "Net Working
Capital" as:

> [T]he difference between the Company's and the
> Subsidiaries' consolidated (A) accounts receivable . .
> . and inventories and (B) accounts payable, . . .
> determined in accordance with GAAP [Generally Accepted
> Accounting Principles] consistently applied and
> following the policies procedures, principles and
> methods employed in preparing the Company's balance
> sheet as of December 31, 2010 included in the
> Financial Statements, and shall be calculated in the
> manner set forth on Schedule 1.04(b)(ii). . . .

SPA § 1.04(b)(ii).

Upon delivery of the Estimated Closing Statement, if the "Estimated Net Working Capital" exceeded the Target Net Working Capital, the difference would be added to $125 million. SPA § 1.04(a)(ii).  If the Estimated Net Working Capital was less than the Target Net Working Capital, the difference would be subtracted from $125 million.  Id.  Similarly, if the "Estimated Net Citicorp Indebtedness" exceeded the Target Net Citicorp Indebtedness, the difference would be subtracted from $125 million and vice versa.  Id.

Within sixty days of the Closing Date, Severstal was required to deliver to RG Steel a "Closing Statement" setting forth the "Net Working Capital," calculated in accordance with Section 1.04(b)(ii), and the outstanding "Net Citicorp Indebtedness" on the Closing Date to set the "Final Purchase Price."  SPA § 1.04(b)(i).  Under Section 1.04(b)(iii), RG Steel had thirty days to review the Closing Statement and prepare a "Protest Notice" contesting any items that it believed were improperly calculated.  SPA § 1.04(b)(iii).  Severstal then had thirty days to object to any items in the Protest Notice.  Id. These final objections by Severstal were defined pursuant to the SPA as the "Contested Adjustments."  Id.

If the parties were unable to amicably resolve the Contested Adjustments, either Severstal or RG Steel would "be entitled to refer any remaining Contested Adjustments to an Independent Accounting Firm." Id. In the absence of an agreement as to which firm, either party could "initiate such a referral to PricewaterhouseCoopers LLP (who will thereafter be considered the 'Independent Accounting Firm' [or "PwC"])." Id. If there were Contested Adjustments submitted to arbitration, the Independent Accounting Firm would then resolve the disputes within "thirty (30) days of its appointment or as soon thereafter as is reasonably practicable." Id. The decision of the Independent Accounting Firm was to be "final and binding on, and shall not be subject to appeal by, Parent or Purchaser and may be entered and enforced by any court having jurisdiction." Id.

After the final determination, the parties would prepare a "Final Closing Statement" setting forth the "Final Net Working Capital" and "Final Net Citicorp Indebtedness." Id. If Final Net Working Capital was less than Estimated Net Working Capital, Severstal would pay RG Steel the difference, and vice versa. Id. Similarly, if Final Net Citicorp Indebtedness was greater than Estimated Net Citicorp Indebtedness, Severstal

6

would pay RG Steel the difference, and vice versa.   SPA §
1.04(b)(iv)-(v).

As part of the SPA, both parties made various
representations and warranties.  In Section 2.06(a), Severstal
stated that the "unaudited consolidated financial statements of
the Company and its Subsidiaries as of December 31, 2010,
consisting of the balance sheet and the related consolidated
statements of earnings and cash flows . . .  have been prepared
in accordance with GAAP, consistently applied throughout the
periods indicated."  SPA § 2.06(a).  Section 2.23 also sets
forth Severstal's representations and warranties with respect to
"Inventory":

> Except to the extent that any such items are taken
> into account in the calculation of Final Net Working
> Capital . . . (ii) the Inventory held by the Company
> and its subsidiaries does not consist, in any material
> amount, of items that are obsolete, damaged or slow-
> moving . . . and is in good and merchantable condition
> in all material respects.

SPA § 2.23.

Article VIII of the SPA sets forth the parties'
substantive rights and procedures with respect to
indemnification in the event of a breach of a representation and

7

warranty by either party.  Section 8.06 provides that, in
general, indemnification is the exclusive remedy for a claim of
breach of representation and warranty.  SPA § 8.06.  Section
8.02, however, specifically carves out certain limitations of
the indemnity obligations of the parties including:

> Except with respect to Losses resulting from a breach
> of the representations and warranties contained in
> Section 2.14, Parents shall have no indemnity
> obligations under Article V or Article VII for Losses
> to the extent that such Losses (1) are reflected as a
> liability of the Company or any Subsidiary on the
> Latest Balance Sheet or (2) are reflected as a
> liability in the calculation of Final Net Working
> Capital as determined pursuant to Section 1.04.[1]

SPA § 8.02(c)(vii).  A "Loss" is defined as "any and all
damages, Liabilities, costs and expenses (including attorneys'
fees)."  SPA § 9.01.  Thus, under Article VIII, a party is
entitled to be indemnified if it suffers, incurs or sustains a
Loss, subject to certain limitations.

        On March 31, 2011, the parties closed the transaction,
effective as of 12:01 a.m. of that day.  Prior to closing, as
required by Section 1.04(a)(i) of the SPA, Severstal delivered

---

[1] Section 2.14 contains representations and warranties with respect to "Environmental Matters" that are not relevant here.  Article V and Article VII deal with "Tax Matters" and "Termination" of the SPA, both of which are similarly not relevant.

the Estimated Closing Statement to RG Steel, which showed
Estimated Net Working Capital of approximately $398.6 million
and Estimated Net Citicorp Indebtedness of approximately $299.8
million.  On May 27, 2011, Severstal prepared and delivered its
Closing Statement to RG Steel which showed Net Working Capital
of approximately $425.9 million and Net Citicorp Indebtedness of
approximately $297.6 million, which resulted in a claim by
Severstal that it was entitled to a purchase price adjustment
totaling approximately $29.4 million in its favor.

On June 16, 2011, RG Steel delivered its Protest
Notice to Severstal objecting to Severstal's calculation of
certain items included in Net Citicorp Indebtedness and Net
Working Capital.  The Protest Notice asserted a decrease in Net
Working Capital of approximately $103.4 million and an increase
in Net Citicorp Indebtedness of approximately $9.0 million,
which resulted in a claim by RG Steel that it was entitled to a
purchase price adjustment totaling approximately $83.0 million
in its favor.

On July 15, 2011, Severstal responded with its
Contested Adjustments and stated that the "proposed adjustments
set forth [in this letter] constitute the Contested Adjustments"
in "accordance with Section 1.04(b)(iii)."  The Contested

9

Adjustments included adjustments relating to the calculation of Net Working Capital. According to Severstal, Section 1.04(b)(iii) requires the application of the same accounting treatments it used to prepare its December 31, 2010 financial statements, regardless of whether those treatments are consistent with GAAP. RG Steel disputes this assertion and contends that Net Working Capital must be calculated in accordance with GAAP, and Severstal's previous accounting treatments should be used only to the extent those treatments are consistent with GAAP.

While RG Steel and Severstal resolved some of the Contested Adjustments, the parties remained divided over a vast majority of them, in the aggregate amount of approximately $89.6 million. According to Severstal, SUSH II's investigation of the adjustments revealed that several of the Contested Adjustments, in the aggregate amount of $44.4 million, were allegedly disguised claims for breach of the SPA.

By letter dated September 13, 2011, RG Steel informed Severstal that it intended to refer the Contested Adjustments to PwC for arbitration. On September 23, 2011, at RG Steel's request, PwC provided the parties with a draft engagement letter setting forth the terms and conditions of PwC's engagement as

10

arbitrator for the purchase price adjustment dispute and asked the parties for comments.

On September 27, 2011, Severstal informed RG Steel that certain Contested Adjustments were not subject to arbitration because they "depend on RG Steel's application of accounting principles and conventions that are different from the accounting principles and conventions used in preparing [Severstal Sparrows Point's] balance sheet as of December 31, 2010, or are premised on the notion that [Severstal Sparrows Point's] balance sheet as of December 31, 2010, was not prepared in accordance with GAAP." Severstal circulated a mark-up of PwC's draft engagement letter to provide that the Contested Adjustments, which it claimed were not arbitrable (the "Disputed Contested Adjustments"), would be carved out of the arbitration.

On October 3, 2011, Severstal commenced the action against RG Steel seeking a declaratory judgment that the $44.4 million in adjustments are not arbitrable. According to Severstal, to the extent RG Steel takes issue with the accounting reflected in earlier financial statements, RG Steel would be limited to asserting a claim under the indemnification provisions of the SPA only.

11

That same day, at PwC's request, the parties held a teleconference with a representative of PwC.  Severstal maintained that the arbitration should not proceed until its declaratory judgment action was resolved.  In response, PwC indicated its view that the arbitration should proceed and include all Contested Adjustments, notwithstanding the pending declaratory judgment action.

In a letter to PwC dated October 5, 2011, Severstal urged PwC not to proceed with the arbitration on the Disputed Contested Adjustments.  On October 12, 2011, PwC held another teleconference with the parties during which it indicated that it would commence the arbitration, but only with respect to the Arbitrable Contested Adjustments.  PwC advised the parties that it would include the Disputed Contested Adjustments in the arbitration only if ordered to do so by a court of competent jurisdiction.  The next day, PwC provided the parties with a revised draft engagement letter and again requested that the parties submit their comments.  PwC also asked the parties to rank three partners of PwC in order of preference, who would serve as the sole arbitrator in the dispute.

One week later, Severstal responded with comments and also sought to have an engagement letter that, in the event that

12

Severstal were ordered to arbitrate the Disputed Contested
Adjustments, PwC would be prohibited from proceeding with such
arbitration until Severstal had fully exhausted its appellate
rights.  Severstal advised PwC of a "procedural issue" that was
currently being addressed "directly between the [parties']
principles," and that "Severstal's agreement to proceed with the
arbitration pending the resolution of the action in the SDNY is
contingent on the resolution of that procedural issue."  The
"procedural issue" relates to a separate claim by Severstal that
RG Steel owes money to a joint-venture between them.

On or about November 1, 2011, the parties reached
substantial agreement on the terms of an engagement letter with
PwC.  By email dated November 1, 2011, Severstal advised PwC
that it would not sign an engagement letter or proceed with
arbitration until the "procedural issue" was resolved.  RG Steel
argues that Severstal's efforts to delay the arbitration should
be stayed according to Section 1.04(b)(iii) of the SPA which
reads, in relevant part:

> If [Severstal] objects to the Protest Notice within
> said thirty (30) day period following delivery to
> [Severstal] of the Protest Notice (the adjustments to
> which Parent objects being referred to herein as the
> "Contested Adjustments"), [Severstal] and [RG Steel]
> shall attempt to resolve the dispute regarding the
> Contested Adjustments.  If a final resolution thereof

is not reached within ten (10) Business Days . . .
either [Severstal] or [RG Steel] shall thereafter be
entitled to refer any remaining Contested Adjustments
to an Independent Account Firm acceptable to Parent
and Purchaser or, in the absence of agreement on the
Independent Accounting Firm within five (5) days of
notice by either Parent or Purchasers of intent to
initiate such referral, to PricewaterhouseCoopers LLP
(who will thereafter be considered the "Independent
Accounting Firm").

Both parties concede that a number of the Contested
Adjustments are arbitrable.  Severstal, however, contends that a
number of remaining Contested Adjustments are not arbitrable,
and must be pursued under the exclusive remedy of indemnity in a
court.

**The Applicable Standards**

A refusal to arbitrate by the non-moving party is "a
prerequisite to compelling arbitration" under the Federal
Arbitration Act ("FAA" or the "Act").  Jacobs v. USA Track &
Field, 374 F.3d 85, 89 (2d Cir. 2004).  Under Second Circuit
precedent, "[a] party has refused to arbitrate if it commenced
litigation or is ordered to arbitrate th[e] dispute [by the
relevant arbitral authority] and fails to do so."  LAIF X SPRL
v. Axtel, S.A. de C.V., 390 F.3d 194, 198 (2d Cir. 2004);
Jacobs, 374 F.3d at 89.  Here, Severstal has unequivocally

14

declined to arbitrate by refusing to comply with the arbitration demand and by commencing an action against RG Steel.

The FAA, 9 U.S.C. § 1 et seq., "reflects a [congressional] recognition of the desirability of arbitration as an alternative to the complications of litigation." Genesco Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 844 (2d Cir. 1987) (internal citations omitted).  The Act "is an expression of a 'strong federal policy favoring arbitration as an alternative means of dispute resolution.'" Ragone v. Atlantic Video at Manhattan Ctr., 595 F.3d 115, 121 (2d Cir. 2010) (quoting Hartford Accident & Indem. Co. v. Swiss Reinsurance. Am. Corp., 246 F.3d 219, 226 (2d Cir. 2001)); see also Stena Line (U.K.) Ltd. v. Sea Containers, Ltd., 758 F. Supp. 934, 937 (S.D.N.Y. 1991) (the FAA "created a federal policy favoring arbitration, which requires that courts rigorously enforce agreements to arbitrate.") (internal citations omitted).  Both the Supreme Court and the Second Circuit have repeatedly held that any doubts concerning the arbitrability of a dispute should be resolved in favor of arbitration.  See, e.g., Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983); Shaw Group Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 120 (2d Cir. 2003).

15

However, as the Supreme Court explained last year in Granite Rock, the federal policy "is merely an acknowledgement of the FAA's commitment to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and to place such agreements upon the same footing as other contracts." Granite Rock Co. v. Int'l Bhd. of Teamsters, -- U.S. --, 130 S. Ct. 2847, 2859, 177 L. Ed. 2d 567 (2010). It cannot be used "as a substitute for party agreement." Id. The Court also explained that the presumption in favor of arbitration arises "only where a validly formed and enforceable agreement is ambiguous about whether it covers the dispute at hand." Id. at 2858; accord E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 294, 122 S. Ct. 754, 151 L. Ed. 2d 755 (2002).

Indeed, courts have long recognized that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." United Steelworkers v. Warrior & Gulf Navig. Co., 363 U.S. 574, 582, 80 S. Ct. 1347, 4 L. Ed. 2d 1409 (1960)). It follows that "[a]rbitration under the [FAA] is a matter of consent, not coercion." Granite Rock, 130 S. Ct. at 2857 (internal quotation marks and citations omitted). It "is a way to resolve those disputes, and only those disputes, that the parties have agreed to submit to arbitration." Id. Thus, under

16

the FAA, "courts must place arbitration agreements on an equal footing with other contracts . . . and enforce them according to their terms." AT&T Mobility LLC v. Concepcion, -- U.S. --, 131 S. Ct. 1740, 179 L. Ed. 2d 742 (2011).  In interpreting an arbitration agreement, courts "must give effect to the contractual rights and expectations of the parties." Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp., -- U.S. --, 130 S. Ct. 1758, 1773-74, 176 L.Ed.2d 605 (2010).

Similarly, under New York law,[2] a party cannot be compelled to arbitrate "unless the agreement to arbitrate expressly and unequivocally encompasses the subject matter of the dispute." Matter of Eastern Minerals Int'l. v. Cane Tennessee, Inc., 274 A.D.2d 262, 266, 713 N.Y.S.2d 29, 32 (1st Dep't 2000) (citation omitted); Gangel v. DeGroot, 362 N.E.2d 249, 250 (N.Y. 1977) ("The agreement to arbitrate must be express, direct and unequivocal as to the issues or disputes to be submitted to arbitration.").

The "arbitrability of a dispute comprises the questions of (1) whether there exists a valid agreement to

---

[2] In Section 10.07, the parties agreed that the SPA "shall be construed and enforced in accordance with and governed by the Laws of the State of New York without regard to the conflicts of Laws provisions thereof."  SPA § 10.07.

arbitrate at all under the contract in question . . . and if so, (2) whether the particular dispute sought to be arbitrated falls within the scope of the arbitration agreement." Nat'l Union Fire Ins. Co. of Pittsburg, Pa. v. Belco Petrol. Corp., 88 F.3d 129, 135 (2d Cir. 1996).  Once a court determines that "the parties have a contract that provides for arbitration on some issues, the question becomes whether a particular merit-related dispute is arbitrable because it is within the scope of a valid arbitration agreement."  Id.  (internal quotations and citations omitted).

On a motion to compel arbitration, "a court's function . . . is limited to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract." Hamilton Life Ins. Co. of N.Y. v. Republic Nat'l Life Ins. Co., 408 F.2d 606, 609 (2d Cir. 1969); In re Chung and President Enters. Corp., 943 F.2d 225, 230 (2d Cir. 1991) ("to determine arbitrability we need only consider whether there exists an interpretation of the parties' agreement that covers the disputes at issue.").  If there exists "[a]ny doubts concerning the scope of the arbitrable issues[, it]  should be resolved in favor of arbitration." Moses H. Cone Mem'l Hosp., 514 U.S at 945; Advanstar Commc'ns Inc. v. Beckley-Cardy, Inc., No. 93-4230, 1994 WL 176981, at *3 (S.D.N.Y. May 6, 1994)

18

(noting that even a "narrow arbitration clause must be construed in favor of arbitration"). Thus, "arbitration should be compelled 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" McAllister Bros. v. A & S Transp. Co., 621 F.2d 519, 522 (2d Cir. 1980) (quoting United Steelworkers of Am., 363 U.S. at 582).

The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." Stena Line, 758 F. Supp. at 932 (quoting McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co., 858 F.2d 825, 830 (2d Cir. 1988)). Accordingly, a court can compel arbitration where there is an indisputably valid and enforceable arbitration provision and that arbitration provision can be interpreted to encompass the parties' disputes. 9 U.S.C. § 4; Hartford, 246 F.3d at 226 (citing Nat'l Union Fire Ins., 88 F.3d at 135).

Here, there is no dispute that the SPA contains a valid and enforceable arbitration provision but only as to which issues are subject to the arbitration. In accordance with the

19

liberal federal policy favoring arbitration agreements and the
provisions of the SPA, it is RG Steel's position that all of the
Contested Adjustments, including the Disputed Contested
Adjustments, should be referred to arbitration and that
Severstal has not met its burden to rebut this presumption by
demonstrating that the arbitration clause "clearly,
unambiguously and unmistakably precludes arbitration" of the
Disputed Contested Adjustments.  (Def. Reply at 1 (quoting <u>Wire
Serv. Guild, Local 222, AFL-CIO v. United Press Int'l, Inc.</u>, 623
F.2d 257, 260 (2d Cir. 1980)).  On the other hand, Severstal
maintains that the SPA contains a limited arbitration agreement
and a price-adjustment mechanism.  (Pl. Opp. at 1).  According
to Severstal, the SPA outlines various representations and
warranties stating that Severstal had prepared or would prepare
certain financial statements in accordance with GAAP and applied
consistently.  (<u>Id.</u>).  Severstal maintains that those agreements
are backed by the seller's promise of indemnity, which would be
the exclusive remedy for RG Steel in the event of an alleged
breach.  (<u>Id.</u>).

        Thus, the question presented by this motion is whether
or not arbitrable issues have been represented in light of the
provisions in the SPA, which are to be determined in accordance
with the above applicable standards.

**The Contested Adjustments Are Arbitrable**

The Contested Adjustments are disputes as to whether
Severstal followed the procedures mandated by Section
1.04(b)(ii) to calculate Net Working Capital.  RG Steel claims
that Severstal did not calculate the Net Working Capital in the
Closing Statement "in accordance with GAAP consistently applied
and following the policies, procedures, principles and methods
employed in preparing the December 31, 2010" financial
statements and therefore their claims are arbitrable.  (Def.
Memo at 13-14).  Severstal argues that RG Steel cannot assert
price adjustment claims grounded on the notion that the GAAP
promises were violated and thus attempt to circumvent the
exclusive-remedy provision in the SPA.  (Pl. Opp. at 1).

Citing to Westmoreland Coal Co. v. Entech, Inc., 794
N.E.2d 667 (N.Y. 2003) for support, Severstal argues for the
proposition that the Contested Adjustments are not arbitrable.
According to Severstal, under Westmoreland and the plain
language of the SPA, the proposed adjustments are not arbitrable
to the extent that they are tantamount to a challenge to
Severstal Sparrows Point's balance sheet as of December 31,
2010.  In Section 1.04(b) of the SPA, SUSH II agreed to prepare

21

its calculation of Net Working Capital in the Closing Statement
in accordance with GAAP.  Thus, Severstal maintains that any
adjustment based on a theory that SUSH II failed to prepare its
calculations in accordance with the terms of the SPA must be
brought as indemnity claims for breach of representation and
warranty under Section 2.06(a).  To further support its
contention, Severstal cites to E*TRADE Financial Corp. v.
Deutsche Bank AG, No. 05-902, 2008 WL 2428225 (S.D.N.Y. June 13,
2008) ("E*TRADE I"), its post-trial ruling in E*TRADE Financial
Corp. v. Deutsche Bank AG, 631 F. Supp. 2d 313 (S.D.N.Y. 2009)
("E*TRADE II"), and the Second Circuit's decision in E*TRADE
Financial Corp. v. Deutsche Bank AG, 374 Fed. App. 119 (2d Cir.
2010) ("E*TRADE III").


        In Westmoreland, the parties disputed whether the
buyer's objections to net asset values in the closing date
balance sheet and income statement were subject to alternative
dispute resolution, pursuant to the SPA's price adjustment
provision.  794 N.E.2d at 668-69.  After the buyer performed due
diligence on the assets and liabilities, it accepted the
seller's representation and warranty that all the interim
financial statements were accurate and prepared in accordance
with GAAP.  Id. at 668.  Based on the interim financial
statements, the SPA pegged the amount of the company's net asset

22

value, and the parties agreed to a purchase price.  Id.  Certain
adjustments for potential changes in net asset value due to
normal operations between the contract date and the closing
date, were contemplated by the parties in the form of a purchase
price adjustment.  Id.  The parties stressed the importance of
consistency in preparing the pre- and post- closing financial
statements, because the statements were "intended to be used for
comparative purposes, the methodology be consistently applied"
to measure the difference in asset values between the contract
date and closing date.  Id. at 670-71.  The court found that
such disputes over the initial baseline constituted claims for
breach of the seller's representations and as such the buyer's
objections that the seller had misrepresented the pre-closing
financials in accordance with GAAP could proceed under the
indemnification provisions and not under the purchase price
adjustment provisions.  Id. at 671.


        Here, the purchase price adjustments required by the
SPA does not begin from audited financial statements which are
adjusted to account for subsequent activity as in Westmoreland.
Rather, the SPA adjusts Estimated Net Working Capital, a
contractually specified metric, to the Final Net Working
Capital.  Both calculations were based upon the March 30, 2011
accounts, as to which no representations were made, and not upon

accounts calculated as of December 31, 2010, the date of the
financial statements which were the subject of the contractual
representations.  Thus, the purchase price is ultimately a
function of the agreed-upon calculation methodology that neither
begins from nor is based upon the financial statements to which
Severstal made representations.  The failure to calculate Net
Working Capital in accordance with GAAP violates the terms of
§ 1.04(b)(iii), but does not call into question the
representations Severstal made concerning the December 31, 2010
financial statements.

        Severstal nonetheless contends that the December 31,
2010 financial statements are relevant to arbitrability because,
as in Westmoreland, "the purpose of the consistency requirement
is to ensure that any price adjustment is based on a change in
value as weighed using the same accounting methodology used to
prepare the earlier balance sheet."  (Pl. Opp. at 17-18).
However, the Westmoreland court's concern and emphasis on
consistent treatment is less salient in the instant case because
here, the matter involves appropriate adjustment, not
comparison.  Unlike in Westmoreland, the purchase price
adjustment here does not call for a comparison of net working
capital at two different points in time and is not designed to
capture changes in net working capital from contract to closing.

24

Additionally, if a claim that Severstal failed to
follow the agreed-upon calculation methodology were not
arbitrable, the arbitration provision would be reduced to
resolving arithmetic errors, at most.  Any claim for a contested
adjustment must necessarily be based on, or could be
characterized as arising out of, a failure to calculate Net
Working Capital in accordance with GAAP consistently applied, as
required by Section 1.04(b)(iii).  Although this Court held in
E*TRADE II that "claims for violation of U.S. GAAP, must be
filed in court," the proposition is not without limits.  631 F.
Supp. 2d at 378.  In E*TRADE II, the purchase price was based
upon "Tangible Stockholders' Equity," as reported in the Closing
Balance Sheet.  Id. at 326.   The seller affirmatively
represented and warranted that the basis for the purchase price
and the baseline for all of the adjustments were prepared in
accordance with GAAP.  Id. at 374.  The initial baseline for
adjustment was a balance sheet to which the seller made express
representations regarding the manner of preparation.  Id. at
326-28.

As discussed above, here, the purchase price
calculations do not flow from the financial statements that were
the subject of Severstal's contractual representation.

25

Severstal did not represent or warrant in the SPA that the
Target Net Working Capital or Estimated Net Working Capital,
which were used to establish the Initial Purchase Price, were
true and correct or prepared in accordance with GAAP.  The
December 31, 2010 balance sheet, which Severstal did warrant, is
neither the baseline for, nor even a component of, the
calculation of Net Working Capital.  The purchase price was
ultimately based upon the actual net working capital at closing
as previously agreed-upon and irrespective of the net capital
amount on December 31, 2010.

In addition, in the E*TRADE decisions on summary
judgment and post-trial, the issue considered was whether
E*TRADE's claims were barred by the arbitration provision, not
whether there was an interpretation of the arbitration clause
which encompassed the disputes.  See E*TRADE I, 2008 WL 2428225,
at *19 ("Section 2.06 of the SPA Does Not Bar E*Trade's
Claims"); E*TRADE II, 631 F. Supp. 2d at 379 ("Because § 2.06 is
inapplicable to the claims at issue here . . . the arbitration
clause [does not] serve[ ] to bar E*TRADE's claims.").

Moreover, even if Westmoreland and E*TRADE are read to
suggest that the arbitration clause could be interpreted to
exclude the Disputed Contested Adjustments, Severstal has not

26

satisfied its burden to rebut the presumption of arbitrability. RG Steel contends that other courts have consistently found similar clauses to encompass similar disputes, and thus they have rejected similar arguments advanced by Severstal to avoid arbitration.  Advanstar, 1994 WL 176981, Luxottica Grp. S.p.A. v. Bausch & Lomb, Inc., 160 F. Supp. 2d 552 (S.D.N.Y. 2001); Gestetner Holdings, PLC v. Nashua Corp., 784 F. Supp. 78 (S.D.N.Y. 1992); Kim v. Transtar Metals, Inc., 726 N.Y.S.2d 87, 88 (1st Dep't 2001) ("The dispute over whether the accounting standards used in the post-closing statement were the same as those used in the pre-closing statement is precisely the type of dispute that the agreement contemplates for arbitration").

For example, in Gestetner, the buyer objected to the final purchase price on the grounds that the Closing Balance Sheet from which it was derived did not, as required by the SPA, comply with GAAP.  784 F. Supp at 79-80.  The buyer sought to compel arbitration, but the seller argued that the claim was not arbitrable because indemnification was the exclusive remedy for breaches of representations and warranties, including contentions that the Closing Balance Sheet fails to comply with GAAP.  Id. at 81.  The court rejected the seller's argument, finding that the dispute was arbitrable because "where claims may be understood to raise an arbitrable issue, arbitration must

27

be compelled, even if the claims can also be characterized
another way." Id. at 82.


        In contrast to the holdings in Westmoreland and
E*TRADE, this Court in Whirlpool Corp. v. Philips Electronics
found that "contracts with provisions providing for accounting
arbitration of financial statements, such as this one, should be
broadly construed to cover all disputes but for those which are
expressly excluded." 848 F. Supp. 474, 479 (S.D.N.Y. 1994).
Whirlpool addressed a dispute between the parties to a purchase
agreement over the valuation of certain fixed assets of the
seller. The buyer "challenged certain accounting methods used
[by the seller to calculate the asset values]" on the basis that
they "had not been computed in accordance with the [a]greement."
Id. at 476. This Court found that it was "difficult to consider
this question as anything but a straightforward accounting
dispute" and that "[d]isputes over financial statements which
rise to the level of external third party account arbitration
necessarily involved complex analytical questions requiring a
determination of what accounting policies and methods should be
applied." Id. at 480.


        In response, Severstal argues that these cases are
distinguishable because (1) they were decided before

                              28

Westmoreland and the E*TRADE decisions, (2) the Second Circuit
purportedly distinguished some of these cases in E*TRADE and
that (3) but for Gestetner, the agreements at issue in those
cases did not contain an exclusive-remedy provision.

While the cases cited by RG Steel were decided before
Westmoreland and the E*TRADE decisions, in E*TRADE III, the
Second Circuit did not overrule any prior decisions.  Rather,
the Second Circuit simply distinguished the specific facts of
the case.  The Second Circuit expressly recognized that "some
district courts in the circuit have suggested that disputes
regarding accounting methods should be resolved by purchase
price adjustment procedures[, and] we conclude that these cases
are distinguishable."  E*TRADE III, 374 Fed. Appx. at 122.

The continuing vitality of the cited cases is further
bolstered by cases upholding arbitration post- Westmoreland.  In
Violin Entm't Acquisition Co., Inc. v. Virgin Entm't Holdings,
Inc., post-Westmoreland, the buyer successfully sought to compel
arbitration over claims that the seller overstated net working
capital.  59 A.D.3d 171, 871 N.Y.S.2d 613 (1st Dep't. 2009).
Similar to Severstal's argument here, the seller contended that
these were non-arbitrable claims for breach of representations
and warranties in failing to comply with GAAP.  The buyer argued

29

that the language of the indemnity clause provided that any
"Losses" relating to "items" in the Net Working Capital were
losses compensable by way of the purchase price adjustment
mechanism.  The court agreed and held that the buyer properly
invoked the accounting arbitration provision and granted the
petition to compel arbitration.

        Moreover, cases since Westmoreland have specifically
addressed that decision's holding.  See id., 59 A.D.3d at 171
(explaining that Westmoreland "does not compel a different
result, as the Court of Appeals there 'merely construed the
agreement before it and did not prohibit sophisticated business
parties from agreeing to varying means of resolving disputes
over adjustments to purchase price'") (internal citation
omitted); McGraw-Hill Co's, Inc. v. School Specialty, Inc., 42
A.D.3d 360, 840 N.Y.S.2d 47 (1st Dep't. 2007) (stating that
Westmoreland did not hold "that arbitration of disputes arising
out of purchase price adjustments is categorically precluded
irrespective of the terms of the agreement in question.  Rather,
the Westmoreland Court merely construed the agreement before
it.").

        In addition, the absence of an exclusive-remedy
provision does not render these cases inapplicable because

                                30

sections 8.02(c)(vii) and 2.23 of the SPA excludes the exclusive-remedy provision as inapplicable to the Disputed Contested Adjustments.   In relevant part, Section 8.02(c)(vii) provides that:

> Except with respect to Losses resulting from a breach of the representations and warranties contained in Section 2.14, Parents shall have no indemnity obligations under Article V or Article VII for Losses to the extent that such Losses . . . (2) are reflected as a liability in the calculation of Final Net Working Capital as determined pursuant to Section 1.04.14.

SPA § 8.02(c)(vii).

Similarly, Section 2.23 sets forth Severstal's representations and warranties with respect to "Inventory" and provides that "[e]xcept to the extent that any such items are taken into account in the calculation of Final Net Working Capital," the Company's inventory "does not consist, in any material amount, of items that are obsolete, damaged or slow-moving . . . and is in good and merchantable condition in all material respects."   SPA § 2.23.

These provisions prohibit double-recoveries under the SPA for the same "Loss" via indemnification and a purchase price adjustment.   The agreement contemplates that a claim under the

31

SPA can have a dual nature, such as those that are capable of being asserted as proposed post-closing adjustments or a claim for indemnification.  For example, if a "Loss" has already been addressed by being "reflected as a liability in the calculation of Final Net Working Capital," the party responsible for the Loss has no indemnity obligation in respect of such Loss.  SPA § 8.02(c)(vii).  Additionally, if a breach of Section 2.23 has already been addressed by "tak[ing] [that Loss] into account in the calculation of Final Net Working Capital," RG Steel would have no claim for indemnification for such Loss.  SPA § 2.23.  This prohibition on double-recoveries for the same harm is only necessary because the parties agreed to have more than one avenue of redress.  Because the SPA does not direct how such a dual-natured claim must be asserted, the presumption is for arbitrability.

An interpretation of Section 8.06, the exclusive-remedy provision, that it is applicable to claims for indemnification and that it can also be characterized as a post-closing adjustment, would render the "exceptions" set forth in Sections 8.02(c)(iii) and 2.23 superfluous.  Such an interpretation must be rejected according to rules of contract construction.  Galli v. Metz, 973 F.2d 145, 149 (2d Cir. 1992) ("when interpreting this contract we must consider the entire

contract and choose the interpretation . . . which best accords with the sense of the remainder of the contract.").

The rule in the Second Circuit is that "if there is a reading of the various agreements that permits the Arbitration Clause to remain in effect, we must choose it." Bank Julius Baer & Co. v. Waxfield Ltd., 424 F.3d 278, 284 (2d Cir. 2005). The existence of competing interpretations of an agreement containing an arbitration provision is not a sufficient basis to overcome the presumption of arbitrability. See, e.g., John Hancock Life Ins. Co. v. Wilson, 254 F.3d 48, 59 (2d Cir. 2001) ("Even if we were to accept [appellants'] interpretation . . . at best it would raise an ambiguity . . . In the face of such an ambiguity, we would be compelled to construe the provision in favor of arbitration"); Coca-Cola Bottling Co. of N.Y., Inc. v. Soft Drink & Brewery Workers Union Local 812, 242 F.3d 52, 56-57 (2d Cir. 2001) (affirming order compelling arbitration notwithstanding "plausible" reading of arbitration clause that would render dispute not arbitrable).  Thus, if an arbitration provision can be interpreted to cover these disputes, then arbitration is appropriate.  In re Chung, 943 F.2d at 230.

33

For the reasons stated above, the Contested
Adjustments, including the Disputed Contested Adjustments, are
arbitrable.


**<u>This Action Is Stayed While The Arbitration Proceeds</u>**


The FAA authorizes a district court to stay litigation
pending arbitration.  <u>See</u> 9 U.S.C. § 3.  A stay is appropriate
where the arbitration will resolve the adjustments at issue
between the parties.  <u>See, e.g.</u>, <u>WorldCrisa Corp. v. Armstrong</u>,
129 F.3d 71, 76 (2d Cir. 1997) (reversing district court's
denial of petition to stay litigation pending arbitration);
<u>Advanstar</u>, 1994 WL 176981, at *3 (compelling arbitration and
staying declaratory judgment action to determine arbitrability).
Here, while Severstal has opposed arbitration and has urged that
a denial of arbitration would eliminate the issue of the stay,
it has presented no opposition to the issuance of a stay should
arbitration be compelled.  (<u>See</u> Pl. Opp. at 25).


The SPA provides that PwC shall serve as the
Independent Accounting Firm to arbitrate the Contested
Adjustments.  PwC has circulated a list of three arbitrator
candidates and the parties have provided PwC with their
confidential views on the candidates.  PwC has requested a

34

telephone conference to discuss the candidate and make a proposal on this issue.  If the parties do not choose an arbitrator at that time, PwC is authorized to appoint a partner of PwC as sole arbitrator with respect to all Contested Adjustments pursuant to 9 U.S.C. § 5.

**Conclusion**

Upon the facts and conclusions set forth above, the motion of RG Steel is granted and the parties are compelled to arbitrate all the Contested Adjustments and this action is stayed until the arbitration is completed upon the appointment by PwC of one of its partners as arbitrator.

It is so ordered.

**New York, NY**
**May 2 5, 2012**

_____
ROBERT W. SWEET
U.S.D.J.

35